J-S23033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| HUGO M. SELENSKI | : | |
| | : | |
| Appellant | : | No. 1265 MDA 2021 |

Appeal from the PCRA Order Entered August 26, 2021
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s): CP-40-CR-0002700-2006

BEFORE:   STABILE, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                **FILED: SEPTEMBER 8, 2023**

Appellant, Hugo M. Selenski, appeals from the order denying his first petition filed under the Post Conviction Relief Act ("PCRA")[1] in which he alleged numerous claims of ineffective assistance by the attorneys who represented him at his jury trial.  We affirm.

This case arises out of the May 3, 2002 killings of Michael Kerkowski, Jr., and Tammy Fassett.  The evidence presented at trial established that Kerkowski was a licensed pharmacist and owner of a pharmacy who was arrested in April 2001 and ultimately convicted of the unauthorized sale of controlled substances.  Appellant befriended Kerkowski while he was awaiting trial and gave him advice on his criminal case.  In March 2002, Kerkowski paid

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

Appellant an amount between $60,000 and $80,000, which Appellant represented to others was for legal assistance he provided to Kerkowski.

Appellant quickly spent the money he had obtained from Kerkowski, including by putting a down payment on a house on Mount Olivet Road in Kingston Township, which was to be purchased in the name of his girlfriend, Christina Strom. Appellant and Strom closed on the purchase of the property on April 30, 2002, but they lacked funds to cover approximately $10,000 in closing costs associated with the transaction. In order to raise the funds to pay the closing costs, Appellant devised a plan with Paul Weakley, a former prison associate, to kill Kerkowski and take the cash that Kerkowski had accumulated while he was selling drugs from his pharmacy.

Appellant and Weakley arrived at Kerkowski's house during the afternoon of May 3, 2002, and discovered that Fassett, Kerkowski's girlfriend, was also present. After socializing and drinking beer for approximately one hour, Appellant pulled out a firearm and ordered Kerkowski and Fassett to the floor. The two were bound with flex ties and duct tape, and Appellant and Weakley tortured Kerkowski by striking him with a rolling pin and strangling him with a zip tie in order to force him into disclosing where his money was located. Kerkowski divulged the location of two bags of approximately $60,000 in his house and told Appellant that his father had possession of an additional $60,000 of the younger Kerkowski's money. Appellant ultimately tightened the zip tie so tightly around Kerkowski's neck that he stopped

breathing and died. Appellant then caused Fassett's death by the same method.

With the money taken from Kerkowski, Appellant was able to pay the closing costs for the purchase of the Mount Olivet Road property. Several days after the murders but before he and Strom moved into the property, he and Weakley buried the two bodies on the Mount Olivet Road Property after Appellant asked the seller of the house to leave the property for a day. Appellant also contacted Kerkowski's parents, who believed at that time that Kerkowski had absconded prior to his May 14, 2002 sentencing hearing. Over the next several months, Appellant convinced Kerkowski's father to give him the $60,000 that Kerkowski had entrusted to his father with the promise that the money would be used to pay Kerkowski's new lawyers who were trying to help him avoid going to prison. Appellant later extorted an additional $40,000 from Kerkowski's father by threatening him with a firearm.

Weakley began providing statements to detectives in June 2003 regarding the killings, although he initially attempted to distance himself from Appellant's actions. Eventually, Weakley confessed to his involvement in the murders and led law enforcement to the burial site on Mount Olivet Road.

As this Court has previously stated:

Following a joint county and state criminal investigation into the deaths of [] Kerkowski[] and [] Fassett, the Commonwealth charged Appellant on May 19, 2006, with two counts each of homicide, conspiracy (homicide), solicitation, robbery, conspiracy (robbery), and one count of theft. After years of preliminary proceedings, appeals, changes of counsel and jurists, discovery, and extensions, Appellant proceeded to a jury trial in January of

- 3 -

2015, which resulted in guilty verdicts on all but [solicitation to commit homicide and conspiracy to commit robbery]. Following a penalty hearing on February 17, 2015, the jury returned verdicts of life imprisonment on the dual first-degree-murder convictions.

The trial court sentenced Appellant on March 27, 2015, to consecutive terms of life imprisonment without possibility of parole, followed by [56] to 120 years of incarceration. Appellant filed a post-sentence motion on April 6, 2015, regarding restitution. The trial court scheduled a hearing for April 29, 2015, where Appellant's post-sentence motion was resolved by stipulation.

*Commonwealth v. Selenski*, No. 904 MDA 2015, 2016 WL 5745642, at *1–2 (Pa. Super. filed Aug. 11, 2016) (unpublished memorandum) (some reformatting; record citations omitted).

Appellant appealed, and on August 11, 2016, this Court affirmed his judgment of sentence. **See id.** Appellant filed a petition for allowance of appeal, which our Supreme Court denied on January 24, 2017. *Commonwealth v. Selenski*, 165 A.3d 890 (Pa. 2017) (*per curiam* order).

Appellant filed a timely *pro se* PCRA petition on August 21, 2017. The PCRA court appointed counsel to represent Appellant and directed him to file any supplemental petition by November 10, 2017. After various extensions were granted, PCRA counsel filed a supplemental PCRA petition on February 19, 2019, and a second supplemental petition on January 13, 2020. The PCRA court held hearings on October 14, 2020, March 12, 2021, and April 8, 2021. Following the hearings and the submission of post-hearing briefs by the

parties, the PCRA court denied relief on August 26, 2021, through an order and accompanying opinion.  Appellant then filed this timely appeal.[2]

Appellant raises the following issues on appeal:

I. The PCRA court erred when holding Appellant[']s argument that trial counsel was ineffective in dealing with witnesses that were called at trial and presenting evidence as it relates to those witnesses lacked merit.

II. The PCRA court erred when holding Appellant[']s argument that trial counsel was ineffective for failing to call witnesses in support of the Appellant[']s defense at trial lacked merit.

III. The PCRA court erred when holding Appellant[']s argument that trial counsel was ineffective in their challenging of the Commonwealth[']s timeline of events lacked merit.

IV. The PCRA court erred when holding Appellant[']s argument that trial counsel was ineffective in their handling of the DNA evidence lacked merit.

V. The PCRA court erred when holding Appellant[']s argument that trial counsel was ineffective for not using the Appellant[']s cell phone records to support the defense at trial lacked merit.

Appellant's Brief, at 7 (unnecessary capitalization omitted).

We review the denial of PCRA relief to decide whether the PCRA court's factual determinations are supported by the record and its legal conclusions are free of error.  *Commonwealth v. Small*, 238 A.3d 1267, 1280 (Pa. 2020).  When supported by the record, the PCRA court's factual findings and credibility determinations are binding on this Court, but we review the lower

---

[2] The PCRA court did not require Appellant to file a concise statement of errors pursuant to Pa.R.A.P. 1925 and entered an order on October 14, 2021, indicating that it was relying on its August 26, 2021 opinion for the reasoning underlying the denial of PCRA relief.

court's legal conclusions under a *de novo* standard of review. *Id.* Our scope of review is limited to the findings of the PCRA court and the evidence of record, which we view in the light most favorable to the Commonwealth, the party who prevailed below. *Id.*

Appellant's arguments in this appeal all concern the purported ineffectiveness of his counsel for his January 2015 trial, where he was represented by Bernard J. Brown, Esquire and Edward J. Rymsza, Esquire.[3] In assessing a claim of ineffective assistance under the PCRA, we begin our analysis with the presumption that counsel has rendered effective assistance. *Commonwealth v. Reid*, 259 A.3d 395, 405 (Pa. 2021). To overcome the presumption, the petitioner must show that:

> (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different.

*Id.* (citation and quotation marks omitted). The petitioner must satisfy all three prongs of this test to obtain relief under the PCRA. *Id.*

_____

[3] Appellant's PCRA issues nearly uniformly concern the conduct of Attorney Brown, his lead counsel at trial. In light of this fact and for the sake of readability, we refer to Appellant's claims as being addressed to the performance of "trial counsel," in the singular, throughout this memorandum. Appellant had a third attorney who represented him at trial, Hugh Taylor, but Appellant expressly disavowed bringing any ineffectiveness claims against Attorney Taylor. *See* N.T., 10/14/20, at 42.

**Witnesses Who Were Called**

<u>Paul Weakley</u>

In his first appellate issue, Appellant argues that that trial counsel was ineffective with respect to various witnesses who testified at trial. Appellant first challenges trial counsel's failure to object to the admission of the federal plea agreement of Paul Weakley, who admitted at trial to his participation with Appellant in the murders of Kerkowski and Fassett. Appellant argues that the plea agreement "improperly makes it look like [Weakley] must be telling the truth." Appellant's Brief, at 11.

We agree with the PCRA court that this claim lacks arguable merit. PCRA Court Opinion, 8/26/21, at 9-10. Trial counsel did in fact object to any mention of the requirement in the federal plea agreement that Weakley testify truthfully, and, while that argument was unsuccessful,[4] the plea agreement was not published to the jury and the Commonwealth did not elicit testimony from Weakley that the agreement required his truthful testimony following trial counsel's objection. *See* N.T. (Trial), at 1012-17. Therefore, the

---

[4] Trial counsel did not object to the admission of Weakley's federal plea agreement but immediately thereafter objected to a question posed to Weakley as to whether the agreement required his testimony in the present trial. N.T. (Trial), at 1012-13. At a sidebar, counsel argued that the Commonwealth should not be permitted to elicit testimony that the plea agreement required Weakley to testify truthfully as that would constitute improper vouching for the credibility of a witness; the trial court overruled the objection. *Id.* at 1013-14.

agreement was not used to make it seem as if Weakley were testifying truthfully, as Appellant asserts.

Appellant next argues that trial counsel was ineffective for not using Weakley's October 21, 2005 prior inconsistent statement as impeachment. In that statement, Weakley told authorities that, on the day of the murders, he dragged Kerkowski and Fassett's bodies out of his car and into the Luzerne residence he shared with Appellant and his girlfriend; at trial, Weakley stated that he stayed at a hotel for the two nights after the murder and left the bodies in his vehicle during this time. PCRA Stipulation 1, ¶3; PCRA Joint Exhibit 1A, at 13; N.T. (Trial), at 1136-41. Appellant contends that using this statement on cross-examination "would [have] help[ed] hammer home the point that Weakley kept changing his story[] and then eventually settled on the story that the police wanted to hear." Appellant's Brief, at 12.

The PCRA court found that trial counsel had a reasonable basis for the decision not to cross-examine Weakley regarding the October 21, 2005 statement. PCRA Court Opinion, 8/26/21, at 11. The court discussed the testimony of Attorney Brown, which it found to be credible, that he extensively cross-examined Weakley regarding his 17 interviews with police and forced him to admit that he "lied a lot of times in [those] different interviews and statements that he made." *Id.* (quoting N.T., 3/12/21, at 22-24). The court further noted Attorney Brown's testimony that "there's only so many times that you can call a liar, liar. At some point, it's got to stop. You've made your

point and you want to stop beating a dead horse." *Id.* (quoting N.T., 3/12/21, at 24).

The PCRA court's determination that trial counsel had a reasonable basis for not impeaching Weakley based upon the October 21, 2015 statement is supported by the record. Attorney Brown examined Weakley regarding his 17 interviews from his first interview in June 2003 to his December 10, 2007 meeting where "the information [he provided finally] start[ed] to comply and comport with" the account he would provide at trial. N.T. (Trial), at 1216-24, 1251, 1272. Attorney Brown questioned Weakley regarding his evolving falsehoods through the course of those interviews, including such lies as that he was not present when the murders occurred and only assisted in reburying the bodies at the Mount Olivet Road property and that Patrick Russin and Kerkowski's ex-wife were involved in the murders. *Id.* at 1224-29, 1233, 1239-40, 1252-53, 1258, 1260. Weakley admitted on cross-examination to being a "liar" with a record of various *crimen falsi* convictions and that he added various details to his accounts to make them more believable. *Id.* at 1224, 1234, 1251, 1261-63, 1281. In short, the record shows that Weakley's mendaciousness was amply probed by trial counsel on cross-examination. We find no basis to second guess the PCRA court's determination that trial counsel's strategic decision to not address every single one of Weakley's lies was reasonable, notwithstanding that the jury ultimately convicted Appellant of the bulk of the charges related to the murders. *See Commonwealth v. Mason*, 130 A.3d 601, 618 (Pa. 2015) (PCRA court does not look into question

of "whether there were other more logical courses of action which counsel could have pursued" and will only find a chosen strategy as not reasonable when an alternative is shown that "offered a potential for success substantially greater than the course actually pursued") (citations omitted).

Appellant next argues that trial counsel was ineffective for not impeaching Weakley's trial testimony concerning the amount of money that Kerkowski gave Appellant in March 2002 with his June 4, 2003 statement regarding the same topic. At trial, Weakley testified that Appellant showed him a shoebox in March 2002 with approximately $60,000 to $80,000 in cash inside that Appellant said Kerkowski paid him "[f]or services he was providing for Mr. Kerkowski"; Weakley stated that the amount of money he testified to was only an estimate as he was never able to physically count the money. *Id.* at 1036-40. In his June 4, 2003 statement, Weakley told law enforcement that Appellant had in his possession a shoebox filled with cash Kerkowski had given him, constituting "an incredibly large sum of money, like maybe a hundred thousand dollars." PCRA Stipulation 2, ¶3; PCRA Joint Exhibit 2A, at 27. Appellant argues that "[a]ny showing that Appellant did not need money would have been useful in destroying the motive issue," and additionally alleges that the conflict between his trial testimony and his earlier statement would have further discredited Weakley's testimony. Appellant's Brief, at 13.

Appellant essentially argues that the prior inconsistent statement should be admitted for two purposes: first, to impeach Weakley based upon his differing accounts at trial and in a prior interview concerning the amount of

cash in the shoebox and, second, as substantive evidence to show that Appellant in fact acquired $100,000 from Kerkowski in late March 2002 and thus would not have had the motive to kill him just over a month later to get more cash. However, pursuant to Pennsylvania Rule of Evidence 803.1(1), a prior inconsistent statement may only be admitted substantively as an exception to the rule against hearsay if it:

> (A) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition;
>
> (B) is a writing signed and adopted by the declarant; or
>
> (C) is a verbatim contemporaneous recording of an oral statement.

Pa.R.E. 803.1(1) (in effect March 18, 2013 to April 1, 2017)[5]; **see also id.**, Comment ("An inconsistent statement of a witness that does not qualify as an exception to the hearsay rule may still be introduced to impeach the credibility of the witness. **See** Pa.R.E. 613."); Pa.R.E. 802 ("Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute.").

Weakley's June 4, 2003 statement, which the Commonwealth stipulated to having been provided to trial counsel before trial, does not meet the requirements of Rule 803.1(1). **See** PCRA Stipulation 2, ¶5; PCRA Joint

---

[5] Rule 803.1(1)(C) was amended subsequent to Appellant's trial to provide that the prior inconsistent statement must have been "a verbatim contemporaneous **electronic** recording of an oral statement." Pa.R.E. 803.1(1)(C) (emphasis added).

Exhibit 2A.  First, the statement was not given under oath and subject to the penalty of perjury at an official proceeding but rather was an informal interview with the Pennsylvania State Police.  Pa.R.E. 803.1(1)(A).  Second, the statement, as admitted at the PCRA hearings, was not signed and adopted by Appellant nor was proof offered that Appellant signed or adopted the statement.  Pa.R.E. 803.1(1)(B).  Finally, while the statement appears to be a transcript prepared from a tape recording to which Weakley consented, **See** PCRA Joint Exhibit 2A, at 1, there is no evidence of record that trial counsel was in possession of the audiotape recording of the June 4, 2003 at the time of trial as opposed to merely the transcript.  Pa.R.E. 803.1(1)(C) (in effect March 18, 2013 to April 1, 2017); **see Commonwealth v. Wilson**, 707 A.2d 1114, 1118 (Pa. 1998) ("[W]hen the prior inconsistent statement is a contemporaneous verbatim recording of a witness's statement, the recording of the statement must be an electronic, audiotaped or videotaped recording in order to be considered as substantive evidence.").  Therefore, Appellant has not demonstrated that Weakley's June 4, 2003 statement was admissible as substantive evidence at trial to show that Appellant did not have a financial motive to kill Kerkowski and Fassett.[6]

_____

[6] Even if the June 4, 2003 statement could be admitted as substantive evidence, we would still find that Appellant has not shown that he was prejudiced by the fact that Weakley was not cross-examined regarding his statement that Appellant had as much as $100,000 of Kerkowski's cash in a shoebox several weeks before the murder.  Both the $100,000 and $60,000 to $80,000 figures were clearly rough estimates as Weakley admittedly never
*(Footnote Continued Next Page)*

To the extent the June 4, 2003 statement could be offered to impeach Weakley, **see** Pa.R.E. 613, the PCRA court's finding that trial counsel had a reasonable basis for not cross-examining Weakley as to every one of his false statements to law enforcement applies equally here. PCRA Court Opinion, 8/26/21, at 11. Attorney Brown was not required to continue "beating a dead horse" regarding Weakley's pattern of lying to authorities, when he had already spent considerable time doing so during his cross-examination. **Id.** (quoting N.T., 3/12/21, at 24).

Appellant next argues that trial counsel was ineffective for not impeaching Weakley with letters he wrote to Appellant's family in which he "ridiculed the Kerkowski family." Appellant's Brief, at 14. Appellant argues that cross-examination of Weakley with these prior inconsistent statements would have rebutted his trial testimony that he was testifying as to his role in the murders because "he wanted to do the right thing and help the Kerkowski family." **Id.** at 13-14; **see also** N.T. (Trial), at 1343-44.

The PCRA court found that Appellant did not meet his burden in establishing his entitlement to relief on this claim. PCRA Court Opinion, 8/26/21, at 12. The court further concluded trial counsel had a reasonable

_____

counted the cash, PCRA Joint Exhibit 2A at 27; N.T. (Trial), at 1036-37, but the import of this testimony was not the amount Appellant started out with or how it was distributed but how the money was quickly exhausted and Appellant then needed to find more to complete the purchase of the Mount Olivet Road property. **See, e.g.**, N.T. (Trial), at 1037 (the money "got burnt through really fast"), 1041 ("shortly after [Appellant] received [the money,] it was all gone").

basis for not using the letters as counsels' strategy was to minimize any sympathy for the Kerkowski family. *Id.* at 14-15. The record supports the PCRA court's conclusions. Appellant did not admit a copy of the letters in the record at the PCRA hearings, nor did he show how these letters would "ridicule" the Kerkowski family or assist in impeaching his testimony that he admitted to his role in the murders "to do what's right for the families of the victims, the Kerkowskis . . ." N.T. (Trial), at 1344. Therefore, he did not prove his entitlement to relief on this claim as required by the PCRA. 42 Pa.C.S. § 9543(a) (a PCRA "petitioner must plead and prove" his entitlement to relief under the PCRA "by a preponderance of the evidence"); *see also Commonwealth v. Bretz*, 830 A.2d 1273, 1276 (Pa. Super. 2003) ("Inherent in this pleading and proof requirement is that the petitioner must not only state what his issues are, but also he must demonstrate in his pleadings and briefs how the issues will be proved.") (citation omitted). Furthermore, Attorney Brown testified at the PCRA hearing that he weighed whether to use the letters and determined that it would not benefit Appellant to disparage the Kerkowski family—which was represented at trial by Kerkowski's octogenarian mother who had lost her son and husband—particularly in light of the fact that trial counsel had already effectively shown that Weakley was a liar. N.T., 3/12/21, at 33-35. We find no fault in the PCRA court's determination that this strategic decision was reasonable. *See Commonwealth v. Williams*, 141 A.3d 440, 463 (Pa. 2016) (when counsel makes an informed strategic choice that could be reasonably viewed at the time as advancing the

- 14 -

defendant's interests, the defendant cannot show that counsel had no reasonable basis for his actions, even though in hindsight counsel's strategy was not successful).

Appellant further contends that trial counsel was ineffective for not rebutting Weakley's claim that he received no benefit for his trial testimony. *See* N.T. (Trial), at 1015-16 (testifying on direct that he received a federal sentence of life imprisonment for the Kerkowski and Fassett murders and had been promised "[a]bsolutely nothing" for his trial testimony). Appellant asserts that counsel should have raised two specific benefits that Weakley received, a move out of solitary confinement when he began cooperating with authorities and the fact that he was not charged with taking his one-time cellmate Francis McBride hostage during an escape attempt.

This claim fails as it lacks arguable merit. Attorney Brown elicited testimony from Weakley on cross-examination that his plea agreement provided that charges related to several robberies and possession of child pornography were dropped as part of his federal plea agreement and that the Luzerne County District Attorney had also agreed not to prosecute him for the instant murders, which could have led to a potential death sentence. *Id.* at 1286-89. Attorney Brown testified at the plea hearing that he investigated whether Weakley received any other benefit for his testimony, including a move to a different facility or a change in status in prison, and uncovered no evidence of any additional benefit; Attorney Brown further testified that he never received any information substantiating the allegation that Weakley

took McBride hostage. N.T., 3/12/21, at 26-28, 55-57. Appellant did not offer any evidence at the PCRA hearing that contradicts Attorney Brown's recollection and showed that Weakley did in fact receive the claimed benefits.

Appellant next claims trial counsel's ineffectiveness for not disputing Weakley's testimony that Appellant came up with the plan to rob and kill Kerkowski. Appellant asserts that trial counsel should have rebutted this testimony by presenting the evidence that a search of Weakley's residence uncovered bomb-making equipment, disguises, and a "how-to-murder manual," which, Appellant maintains, would have shown that the robbery and murders were not "an abrupt decision by Appellant" and instead that Weakley was involved in the planning. Appellant's Brief, at 13-14.

The PCRA court found that trial counsel had a reasonable basis for not raising the defense that Appellant was not involved in the planning of the crimes because Appellant himself decided not to pursue this theory. PCRA Court Opinion, 8/26/21, at 13. This finding has support in the record. Attorney Brown testified that trial counsel developed the theory that Weakley and Russin devised and carried out the plan to rob and kill Kerkowski without any participation or knowledge by Appellant, which Attorney Brown believed "would be [a] successful [defense] based on [his] review of the evidence." N.T., 3/12/21, at 28-29. However, Attorney Brown explained that this strategy "got shot down [by Appellant] and it wasn't something that [Appellant] wanted to put forth for reasons that were in the testimony in the Commonwealth's . . . case." *Id.* at 29. Appellant's decision to not pursue the

strategy that Weakley independently planned to rob and kill Kerkowski explains why the trial counsel raised the "[d]isguises, bomb-making equipment, [and] a magazine with a how-to-murder manual in it" found in Weakley's home in the defense's opening statement, N.T. (Trial), at 82, but did not cross-examine Weakley related to this evidence at trial.

Additionally, as the PCRA court found, there is no arguable merit to the claim that cross-examination on the discovery of these items in Weakley's home would have cast doubt on Appellant's participation in the planning of the crimes. PCRA Court Opinion, 8/26/21, at 13. These items were apparently found during a search in June 2003 after the murders at issue in this case when Weakley was arrested for a separate robbery, N.T. (Trial), at 81-82, and therefore they do not show Weakley's planning of the crimes at issue here, which took place more than one year prior. Further, the items uncovered during the search have no apparent relation to the subject crimes: Weakley and Appellant did not use disguises but instead entered Kerkowski's home under the pretenses of a social visit and there is no indication that a bomb was ever intended to be used. **See id.** at 1051-60 (describing materials gathered by Weakley and Appellant in anticipation of the crime); N.T., 3/12/21, at 31-32 (Attorney Brown explaining that he did not know "how bomb making equipment . . . would be relevant" to the case). Moreover, Appellant did not make any presentation regarding the contents of the magazine "how-to-murder manual" that could in any way show that it was involved in the preparation of the killings at issue in this case.

The final claim concerning Weakley relates to a 2006 statement he made in federal court that "they wanted him to admit to crimes he did not commit." Appellant's Brief, at 14. Appellant argues that this statement "could have been used to further support the argument that Weakley would change his story and say whatever he needed to in order to help himself." *Id.*

The PCRA court found that this claim lacked arguable merit as there was no evidence that trial counsel was in possession of this statement at the time of trial. Attorney Brown testified that he was not provided with a transcript documenting the statement in discovery, and that trial counsel did not uncover it during pre-trial investigation. N.T., 3/12/21, at 32-33. Appellant has made no showing that trial counsel was or should have been aware of this alleged statement by Weakley at the time of trial. Therefore, this issue warrants no relief.

<u>Louise Bensacon</u>

Appellant's next argument concerns Louise Bensacon, Kerkowski's neighbor, who testified that she observed a man with a tattoo driving away from Kerkowski's house as a passenger in a brown car at approximately 5:00 p.m. on May 3, 2002, the date of the murders. N.T. (Trial), at 1392-1405. Bensacon identified Appellant as the individual she saw on the date of the murders from a contemporaneous photograph of Appellant and the brown vehicle from a photograph as one that belonged to Carey Bartoo, an acquaintance of Appellant who stated at trial that she may have given him a

ride from Kerkowski's house on that date. *Id.* at 111, 1399-1401, 1479-83; Commonwealth Trial Exhibits 4, 145.

Appellant argues that Bensacon's "overreaching" account "was not challenged enough" by trial counsel, Appellant's Brief, at 14-15, and that she should have been asked various questions on cross-examination, including why she contradicted her deposition testimony that her children were of elementary school age by testifying at trial that they were in junior high school and high school. Appellant further notes that trial counsel did not call into question Bensacon's improbable testimony that she was working at a desk in her home by the window and yet "somehow was paying close enough attention to what was happening outside her window to see Appellant." *Id.* at 14. Appellant posits that trial counsel should have asked why Bensacon continued to stare with locked eyes at Appellant despite the fear this aroused in her and why she did not tell police about this memorable episode notwithstanding the fact that she kept a journal, at the request of Kerkowski's mother, of the comings and goings from Kerkowski's house beginning on May 3, 2002.

We agree with the PCRA court that this claim of trial counsel's allegedly faulty cross-examination of Bensacon lacks merit. PCRA Court Opinion, 8/26/21, at 15-16. Attorney Brown thoroughly cross-examined Bensacon, raising numerous issues that would call her observations into doubt, including why she would have noticed a vehicle drive by her house when she was sitting at her desk and engaged in crafts, the fact that she did not tell police during an interview a week after the murders that she had seen the brown car, and

how she never recorded seeing a man in her car in her journal or reported this information to Kerkowski's parents, or indeed to anyone, for over four years. N.T. (Trial), at 1408-09, 1414-20, 1424-27, 1448-49. In addition, Attorney Brown also addressed Bensacon's near and farsightedness and a potential obstruction to her view from her window, in the form of a rhododendron bush. *Id.* at 1403-04, 1407-08.

Further, while Appellant argues that Bensacon should have been examined regarding the contradiction between her account of her children's age in her trial and deposition testimony, this claim is wholly unsubstantiated as her deposition transcript was not admitted into the record at the PCRA hearing. In any event, Appellant has not explained why a mother's apparent misstatement of the age of her own children would damage her credibility as to an eyewitness observation in a murder trial. Finally, Appellant's claim that trial counsel should have asked Bensacon why she "locked eyes" with Appellant as he was seated in the passenger seat of the brown car, Appellant's Brief, at 15, is unsupported by the record where Bensacon merely testified that she observed Appellant staring at her house, not her specifically. N.T. (Trial), at 1401-02.

<u>Geraldine Kerkowski</u>

Appellant argues that trial counsel was ineffective for not offsetting the sympathy that was aroused during the Commonwealth's direct examination of Geraldine Kerkowski, Michael Kerkowski's mother, by eliciting facts that made the "whole [Kerkowski] family look bad." Appellant's Brief, at 16. These facts

included testimony concerning the fact that Geraldine and Michael Kerkowski, Sr., her husband and the victim's father, knew that their son was involved in criminal acts yet hid a significant amount of Michael Kerkowski's ill-begotten gains in their home, the parents' removal of $40,000 in cash from their son's house after his disappearance without telling the police, and the fact that the parents paid off their son's bail bondsman after he did not show up for sentencing.

However, as Attorney Brown pointed out in his PCRA hearing testimony, Geraldine Kerkowski was in her eighties at the time of trial, of diminutive stature, and she had recently lost her husband; Attorney Brown believed that it would not benefit Appellant's defense to disparage an aging widow and mother of a murder victim by raising her involvement in illegal acts. N.T., 3/12/21, at 34-35. Attorney Brown's strategy was thus to "[t]ry to get her on and off as quick as possible." *Id.* at 68. Attorney Brown further explained that the victim's father was much more involved with the illegal acts than his mother and therefore he would have raised these issues with the father, if he were alive and testified at trial, but that it would "be very difficult to get to the bottom [of these issues] through Mrs. Kerkowski." *Id.* at 64-66.

Citing Attorney Brown's testimony, the PCRA court found that trial counsel had a reasonable basis for not questioning Mrs. Kerkowski regarding her awareness of her son's crimes and what little involvement she may have had in covering up his misdeeds. PCRA Court Opinion, 8/26/21, at 16. The record supports this conclusion.

Appellant also argues that trial counsel could have challenged the Commonwealth's timeline of the events before and after the murders on May 3, 2002 by asking Mrs. Kerkowski to resolve the contradiction between her trial testimony that she called her son's house on that date between 2:30 and 4:00 p.m. and spoke to Fassett for 15 minutes, N.T. (Trial), at 354, and her preliminary hearing testimony that the call was closer to 4:00 p.m. PCRA Exhibit D-3, at 63-64. However, as the PCRA court explained in its opinion, this claim lacks arguable merit as Attorney Brown did attempt, unsuccessfully, to establish the exact time of the call during cross-examination of Mrs. Kerkowski. PCRA Court Opinion, 8/26/21, at 16. Attorney Brown asked Mrs. Kerkowski whether the call was closer to 4:00 p.m. than 2:30 p.m., but she stated that she "really can't say" and did not remember when the call occurred exactly, except that it was during the afternoon and shortly before Kerkowski and Fassett were to leave and pick up the victim's children from daycare. N.T. (Trial), at 432-33; PCRA Court Opinion, 8/26/21, at 16.

### Robert Steiner

Appellant challenges trial counsel's examination of Robert Steiner, the owner of the Mount Olivet Road property, which Appellant and his girlfriend, Christina Strom, purchased in late April 2002 and on which Appellant and Weakley buried the bodies of Kerkowski and Fassett. Appellant first argues that trial counsel was ineffective for not confronting Steiner with statements during his deposition testimony that would have called into question whether it was plausible that the bodies were buried without being seen. Specifically,

Appellant points out Steiner's deposition testimony that trees and shrubbery were removed in the portion of the Mount Olivet Road property where the bodies were buried, opening up that area to view of passersby. PCRA Joint Exhibit 4A, at 78-79.

The PCRA court determined that there is no arguable merit to this ineffectiveness claim, a finding that has support in the record. PCRA Court Opinion, 8/26/21, at 17. While Steiner testified at his deposition that the trees and shrubs along the property line were removed, he further stated that the vegetation remained through May 15, 2002—the day he moved out of the Mount Olivet Road property and several days after the bodies were buried— and at trial he similarly indicated that the trees and shrubs were still there when he left the property. PCRA Joint Exhibit 4A, at 78-79; N.T. (Trial), at 585-86. Thus, trial counsel's examination of Steiner on this point would not have shown that the trees and shrubs did not shield the burial from public view.

Appellant also argues that trial counsel was ineffective for not raising the issue discussed in his deposition testimony regarding a house that was being built across the street from the Mount Olivet Road property at the time of the sale, PCRA Joint Exhibit 4A, at 26, which Appellant contends would have placed construction workers in the vicinity who could have seen the burial process. We agree with the PCRA court that Appellant has not shown prejudice from this alleged claim of deficient performance by counsel. Notwithstanding Steiner's deposition testimony as to a house being built across the street, he

did not indicate whether construction was ongoing at the time of the burial and whether workers at the construction site would have been in a vantage point where they could have seen Weakley and Appellant digging on the property. Absent any further evidence regarding the under-construction home, Appellant's claim that examination of Steiner on this topic would have strengthened the defense is merely speculative. Moreover, as discussed throughout this memorandum decision, the Commonwealth presented overwhelming evidence of Appellant's guilt in the robbery and murder of Kerkowski and the murder of Fassett.[7]

_____

[7] This evidence includes Paul Weakley's testimony regarding Appellant's role in the planning of the crimes, the robbery and murders, and burial of the bodies; the eyewitness testimony of Louise Bensacon showing that Appellant left Michael Kerkowski's house on the date of the murders; the testimony of Appellant's girlfriend, Christina Strom, regarding their immediate need to raise approximately $10,000 to cover the closing costs associated with the purchase of the Mount Olivet Road property; testimony of a bank employee showing that Appellant deposited approximately $10,000 in Strom's account the day after the robbery and murders; Appellant's and Weakley's statements to Patrick Russin regarding Kerkowski's murder prior to the discovery of the bodies; the June 2003 discovery of the bodies on the Mount Olivet Road property, where Appellant was then living; Steiner's testimony that Appellant asked him to absent himself from that property in the days after the murders; Samuel Goosay's testimony regarding Appellant's participation in a robbery of Goosay that had similar characteristics to the Kerkowski robbery; and Appellant's statement in a prison recording, "If I did do it, who gives a fuck?," referring to the murders.

Additional evidence of Appellant's guilt not otherwise discussed in this decision includes the testimony of Rodney Samson that Appellant offered him $20,000 in April 2002 to assist in "[t]aking care" of Kerkowski, which Samson understood to be a reference to murder; Carey Bartoo's testimony that Appellant gave her $1,000 several hours after the murders occurred and told her to give $300 of that amount to Kim Kerkowski, Bartoo's cousin and Michael
*(Footnote Continued Next Page)*

Appellant's last ineffectiveness claim with respect to Steiner relates to a statement he made to defense investigator Bill Jesse in April 2005 that Appellant asked Steiner to leave the Mount Olivet Road property for a day prior to the closing. PCRA Exhibit D-5, at 2. Appellant claims that, because the closing occurred on April 30, 2002, several days prior to the murders, N.T. (Trial), at 606, any pre-closing effort by Appellant to have Steiner vacate the property could not have related to the murders in any way. Nevertheless, as the PCRA court observes, Steiner clearly testified at his deposition and at trial that Appellant's visit to ask if Steiner could vacate the property for a day occurred in the several days after the closing when he continued to live on the Mount Olivet Road property under an occupancy agreement executed at closing. PCRA Joint Exhibit 4A, at 64-65; N.T. (Trial), at 613-16; PCRA Court Opinion, 8/26/21, at 17. We agree with the PCRA court that Appellant has not shown prejudice from trial counsel's decision not to confront Steiner with his statement to Jesse, in light of the overwhelming evidence against Appellant and where Appellant has not shown that Steiner would have changed his sworn deposition and trial testimony based upon the defense investigator's notes of a conversation with him. PCRA Court Opinion, 8/26/21, at 17.

---

Kerkowski's ex-wife, "from Michael"; Appellant's offer, made five days after the murders, to Kim Kerkowski's boyfriend to pay for diapers and food for Michael and Kim's children; and the testimony of Ernie Culp, the tenant on the Mount Olivet Road property, that he saw Appellant and Weakley in early May 2002, holding digging implements, near a freshly dug patch of land on the property. N.T. (Trial), at 191-97, 658-664, 1476-75, 1564-69.

Christina Strom

Appellant argues that trial counsel was ineffective for not eliciting testimony from Christina Strom that her motive for providing negative testimony against Appellant was to receive a lighter sentence in a related prosecution. This claim lacks arguable merit as Strom did in fact testify on direct regarding her federal guilty plea agreement to resolve money laundering and perjury charges associated with the investigation into the Mount Olivet Road property transaction; Strom had not been sentenced as of the date of trial, and the agreement required her to cooperate and testify truthfully in the prosecution of Appellant. N.T. (Trial), at 713-18. On cross-examination, Attorney Brown raised Strom's cooperation and how "it's to [her] benefit" to testify against Appellant in the present case, while also discussing Strom's lies in earlier proceedings that had led to her perjury prosecution. *Id.* at 841-43, 910-12.

Appellant also contends that trial counsel should have asked Strom whether Appellant smoked cigarettes, as this evidence would have undermined the testimony of Samuel Goosay. Goosay was the victim of an unrelated robbery committed by Appellant and Weakley under similar circumstances that was admitted at trial to show Appellant's identity as a perpetrator in the robbery, and ultimate killing, of Kerkowski. At trial, Goosay identified Appellant as one of the robbers and stated that the two smoked a cigarette together. *Id.* at 2333-34. We agree with the PCRA court's determination that Appellant has not shown prejudice from trial counsel's

failure to ask Strom whether Appellant smoked as he "has not provided any evidence showing [she] would have testified that [Appellant] did not smoke." PCRA Court Opinion, 8/26/21, at 18. Appellant's claim is purely speculative as to what Strom would testify if asked that question. Furthermore, as noted above, the Commonwealth presented overwhelming evidence of Appellant's guilt.

### Cheryl Breen

The next claim of ineffectiveness concerns the testimony of Cheryl Breen, a bank teller, who testified at trial that Appellant deposited $9,900 in Strom's checking account on Saturday, May 4, 2002, the day after the murders, and explained that it was for the purpose of buying a house with Strom. N.T. (Trial), at 1492-1500. Breen further stated that Strom had only $400.46 in her account prior to the deposit and that a check was drawn from her account in the amount of $10,079.50 on the following Monday. *Id.* at 1501-02.

Trial counsel did not cross-examine Breen. *See id.* at 1502. Appellant argues that counsel should have asked her various questions to probe the veracity of her account, and to see if it is possible whether the deposit occurred prior to the murders, which would have called into question the alleged motive for the robbery. Specifically, Appellant avers that trial counsel should have asked Breen (1) whether she worked on the date of the alleged deposit; (2) whether there were cameras at the bank that would have captured the transaction; (3) whether a deposit on Friday, May 3, 2002 would have also

cleared on the following Monday; and (4) why Appellant was so recognizable to her that she came forward to authorities nearly two years after the murder after seeing his picture on a TV news program.

Appellant's claim lacks arguable merit. While Breen did not specifically state that she was working on the Saturday in question, it is readily apparent from her testimony that she was working that day as she stated that the transaction occurred on the Saturday, as documented by copies of bank statements, and she observed Appellant, spoke with him, and recalled the manner in which the bills were wrapped in a rubber band. *Id.* at 1493-1500; Commonwealth Trial Exhibits 88, 89. Breen also explained to the jury that Appellant's appearance was memorable to her based upon his "very sparkly" eyes. N.T. (Trial), at 1496. Finally, while Appellant contends that trial counsel should have asked Breen whether there were cameras at the bank or whether the deposit could have been made the day before, there is simply nothing in the record to support a claim that such questions would have led to Breen providing testimony favorable to the defense.

<u>Patrick Russin</u>

Appellant raises four claims of trial counsel ineffectiveness with respect to the cross-examination of Commonwealth witness Patrick Russin, who testified that, during the period after the victims' murders and prior to the discovery of the bodies, he participated in Appellant's efforts to extort money from Kerkowski's father and had conversations with Appellant in which Appellant alternately said that Kerkowski was dead and alive. N.T. (Trial), at

2078-92. Appellant first argues that his attorneys provided ineffective representation by not cross-examining Russin regarding his inconsistent statements in discovery as compared to his testimony at the "Rudy Redman" trial.[8] The PCRA court rejected this claim, finding that trial counsel had a reasonable basis for not cross-examining Russin based on his "Rudy Redman" trial testimony as he did not want to provide the opportunity to introduce evidence that would cast Appellant in a negative light. PCRA Court Opinion, 8/26/21, at 20. This conclusion is supported by the record. Attorney Brown testified at the PCRA hearing that he was concerned about "[o]pening the door" to "Rudy Redman" trial evidence, N.T., 3/12/21, at 22-23, 41, and the trial transcript reflects that a sidebar conference took place in which counsel discussed how to raise issues related to the "Rudy Redman" trial, such as Russin's plea in that case that required his cooperation in the present trial, without opening the door to a discussion of the facts of the killings. N.T. (Trial), at 2030-38.

Appellant next claims that trial counsel was ineffective for not cross-examining Russin with respect to a statement he made to officers during a June 5, 2003 police interview: "Do you want me to say [Appellant] and

---

[8] The "Rudy Redman" trial refers to the killing of two individuals known by their nicknames "Rudy" and "Redman"; Russin entered a guilty plea to third-degree murder with respect to those killings and testified at Appellant's 2006 trial in that case. N.T. (Trial), at 1456, 2030-32, 2069. While the result of that trial is not entirely clear from the record in this case, it appears that Appellant was not found guilty of the "Rudy Redman" killings.

[Weakley], is that the story? Okay?" PCRA Exhibit D-12, at 1. Appellant asserts that this interview shows that Russin was "trying to tell the police the story they want to hear," rather than what truthfully happened. Appellant's Brief, at 20. However, aside from introducing a two-page excerpt of the interview at the PCRA hearing and the Commonwealth's stipulation that this document was provided to defense counsel during discovery, *id.*; N.T., 10/14/20, at 24-25, Appellant did not present any additional evidence to demonstrate why trial counsel was ineffective for not cross-examining Russin on this statement. Appellant does not acknowledge that the June 5, 2003 police interview occurred on the date that police unearthed Kerkowski and Fassett's bodies on the Mount Olivet Road property and also arrested Russin, who was also living at that property, or that Attorney Brown extensively cross-examined Russin on the series of interviews with police investigators beginning on June 5, 2003 that ultimately led to his cooperation in this case. N.T. (Trial), at 2069, 2093-99, 2106. In the absence of any demonstration how cross-examination of Russin on a single comment during a contentious police interview would have led to a reasonable probability of a different outcome in a proceeding where an overwhelming amount of evidence was elicited to show Appellant's guilt, we conclude that Appellant has not demonstrated prejudice with respect to this ineffectiveness claim.

In his third ineffectiveness claim with respect to Russin, Appellant argues that trial counsel did not cross-examine Russin regarding the benefit he received from testifying. Specifically, Appellant avers that Russin was not

charged for selling Kerkowski's gun, extorting money from Kerkowski's father, and for his role in two separate burglaries. "Together," Appellant contends, "these items would [have] put doubt in the jury's mind as to whether Russin was making up a story, telling the police what the[y] wanted to hear, [] all to get himself out of trouble." Appellant's Brief, at 21. As the PCRA court observed, however, Russin extensively testified regarding the benefit he received in his plea bargain in the "Rudy Redman" case of a 10-to-20-year sentence from testifying truthfully in the present prosecution of Appellant. N.T. (Trial), at 2066-72, 2111-15. Appellant has failed to present any evidence in the PCRA proceedings demonstrating any additional benefit that accrued to Russin from his testimony. Therefore, we conclude that Appellant's claim that counsel failed to cross-examine Russin regarding the benefits he received from his testimony has no arguable merit.

Finally, Appellant contends that trial counsel was ineffective for not asking Russin whether he was aware that Weakley told his cousin, Attorney Basil Russin, that he knew where the victims' bodies were buried on the Mount Olivet Road property in December 2002, six months before the bodies were discovered by police. Russin discussed this conversation in a July 14, 2003 police interview, which trial counsel was provided during discovery. *See* PCRA Exhibit D-13; N.T., 10/14/20, at 26. Attorney Brown did examine Russin regarding Weakley's revelations to Russin and his cousin regarding his involvement in the murders in December 2002, N.T. (Trial), at 2103-04, but Attorney Brown did not specifically mention that Weakley sought immunity, a

fact that Russin related in his July 14, 2003 interview, PCRA Exhibit D-13, and which Appellant now argues "shows that [Weakley] was scheming to find a way of getting himself benefits to this and other legal cases in exchange for information." Appellant's Brief, at 21.

Notwithstanding trial counsel's failure to ask Russin regarding Weakley's attempt to get immunity in December 2002 in exchange for providing information relating to the murders, we find that Appellant has not shown prejudice from this ineffectiveness claim. Weakley's statements to Attorney Russin in December 2002 are consistent with Weakley's trial testimony concerning the murders and burial of the bodies and therefore it is unclear what additional value would be obtained regarding a further examination of Russin regarding what he overheard of this conversation. Furthermore, Weakley was cross-examined himself regarding his December 2002 "confession" to Attorney Russin, N.T. (Trial), at 1224-25, and Weakley's various attempts to use his knowledge of the murders for his own benefit were exhaustively run through during his cross-examination. *See supra*.

Samuel Goosay

Appellant raises two PCRA claims issues concerning Samuel Goosay, a Commonwealth witness who testified regarding his role as the victim of a home invasion robbery committed by Appellant and Weakley involving similar methods as the Kerkowski robbery. Appellant first submits that trial counsel should have cross-examined Goosay on the discrepancies between his trial account of the robbery and his earlier statements to police, including on the

issue of whether the robbers used a bag or pillowcase and regarding the number of individuals involved in the robbery. However, Attorney Brown explained at the PCRA hearing that he was in the process of questioning Goosay on the details of the robbery when Appellant informed Attorney Rymsza that he was not happy that facts related to the robbery were being discussed during cross-examination while an appeal in that case was pending at the time.[9]  N.T., 3/12/21, at 43.  Attorney Brown stated that, because Appellant did not want to pursue cross-examination of Goosay on topics related to the facts of the robbery, a recess was taken and afterward Attorney Brown "recalibrate[d]" his cross-examination of Goosay to steer clear of those topics.  *Id.* at 43-44.  The trial transcript confirms this account as a recess was taken during the cross-examination of Goosay, which had to that point concerned the events of the robbery, N.T. (Trial), at 2356-63, and after the recess Attorney Brown switched his focus to Goosay's subsequent police identification of his assailants after the robbery.  *Id.* at 2366-76.  On the basis of Attorney Brown's testimony, the PCRA court concluded that counsel's performance could not have been deficient in not asking Goosay about discrepancies between his accounts of the robbery when Appellant personally

_____

[9] ***See Commonwealth v. Selenski***, 158 A.3d 102, 104-05 (Pa. Super. 2017) (discussing procedural history of direct appeal from Goosay robbery convictions, which showed that direct appeal was pending at time of January 2015 trial in this matter, following remand from the Pennsylvania Supreme Court).

instructed counsel not to delve into these issues further, PCRA Court Opinion, 8/26/21, at 20-21, and we concur in that determination.

Appellant also claims that trial counsel should have cross-examined Goosay regarding his pulling out a pack of cigarettes from his shirt pocket and handing a cigarette to Appellant just after the two had been involved in a fight over Appellant's gun that involved them rolling around on the floor and punching each other. N.T. (Trial), at 2329-34. Appellant argues that this account "is not believable" and, if challenged, would have led to the jury calling into question Goosay's entire trial testimony. Appellant's Brief, at 21. This claim merits no relief as Attorney Brown had a reasonable basis for not questioning Goosay regarding his interactions with Appellant; as discussed in the prior paragraph, Appellant expressed his desire during trial that his counsel not delve into the facts of the robbery while his direct appeal was pending. Furthermore, Appellant has not demonstrated prejudice to this claim based upon (1) the fact that he did not demonstrate that Goosay would answer the question in a way favorable to the defense; (2) Appellant has not shown that questioning regarding the issue of whether Goosay had a pack of cigarettes in his shirt pocket could potentially have led to a different result in light of the overwhelming evidence of Appellant's guilt; and (3) Weakley provided independent confirmation of Appellant's participation in the Goosay robbery. N.T. (Trial), at 1189.

#### Brook Selenski

Appellant argues that trial counsel was ineffective in the examination Brook Selenski, Appellant's younger sister who testified as a defense witness that Appellant invited her onto the Mount Olivet Road property in 2002 and 2003 when she was approximately 12 years old and she explored the full property on foot and on all-terrain vehicles without Appellant placing any limit on what parts of the property she could visit. N.T. (Trial), at 2464-68. Appellant argues that trial counsel should have questioned his sister regarding how "Weakley was obsessed with Appellant's family and gave Brook gifts," which Appellant argues would have further undermined Weakley's credibility. Appellant's Brief, at 21-22. We agree with the PCRA court that Appellant failed to prove his entitlement to relief on this claim by not pointing to any evidence of Weakley's obsession with Appellant's family or any gifts that were given to Appellant's sister. PCRA Court Opinion, 8/26/21, at 21; *see also* 42 Pa.C.S. § 9543(a); *Bretz*, 830 A.2d at 1276.

#### Ronald Selenski, Jr.

Appellant argues that trial counsel was ineffective for calling Appellant's brother, Ronald Selenski, Jr., as a witness when he provided no benefit for the defense and "was a better witness for the Commonwealth" because the Commonwealth was able to play a short excerpt of an audio recording of a prison conversation where Appellant stated, "If I did do it,"—referring to the murders—"who gives a fuck?" N.T. (Trial), at 2492; Appellant's Brief, at 22.

Appellant is entitled to no relief on this claim. First, we note that Ronald did provide beneficial testimony for the defense, stating that Appellant provided him with free rein to drive all-terrain vehicles on the Mount Olivet Road property and that the digging implements found on the property were used to create trails for the vehicles and other construction projects. N.T. (Trial), at 2476-81. Second, as the PCRA court observed, the recording could have been admitted by the Commonwealth during its case as it fell within the hearsay except for a statement of an opposing party. *See* Pa.R.E. 803(25)(A); *Commonwealth v. Edwards*, 903 A.2d 1139, 1157-58 (Pa. 2006). Therefore, we find no arguable merit to the claim that trial counsel's decision to call Ronald damaged, rather than benefited Appellant's case.[10]

_____

[10] Further contributing to our decision that the decision to call Ronald Selenski, Jr., was not constitutionally ineffective is the fact that Ronald was not in fact Appellant's interlocutor on the audio tape in which Appellant made the incriminating statement at issue. After the Commonwealth's cross-examination of Ronald, a recess was taken and the defense requested that it be permitted to play an approximate six-minute excerpt of the recording, which the trial court permitted. N.T. (Trial), at 2495-99. When Attorney Brown played the longer excerpt during redirect, Ronald confirmed that it was his and Appellant's father—Ronald Selenski, Sr.—with whom Appellant was speaking, rather than Ronald Jr. *Id.* at 2502-04. Therefore, trial counsel was not ineffective for calling Ronald Jr. as a witness to open the door for the playing of the recording in which Appellant stated, "who gives a fuck?" about whether he had killed Kerkowski and Fassett, *id.* at 2492, because Ronald Jr. was not the individual to whom Appellant made that statement. To the extent Appellant could have argued that trial counsel was ineffective for not objecting on the basis that the recording was being admitted on the wrong witness (Ronald Sr. was deceased at the time of trial, *id.* at 2504), that is not a claim that Appellant raised in his PCRA petition.

Appellant also argues that trial counsel's performance was deficient because Ronald was not asked about "Appellant ma[king] a $9,436.00 cash deposit on a truck for Ronald just days before the bad check was written by" Strom. Appellant's Brief, at 22. Appellant argues that such evidence would have challenged the "crux of the case on motive," as it would have made "no sense for [Appellant] to make this cash deposit," if he "knew that he had to come up with almost the same amount for a closing just days later." *Id.*

Appellant has not sufficiently proved his entitlement to relief on this claim. *See* 42 Pa.C.S. § 9543(a); *Bretz*, 830 A.2d at 1276. Appellant provided no evidence to substantiate that he made the deposit for Ronald's truck or that his counsel was aware of the deposit[11] and he does not even allege how long prior to the Kerkowski robbery this alleged deposit occurred. In any event, we would agree with the PCRA court that Appellant did not show prejudice from trial counsel's failure to cross-examine Ronald on the deposit in light of the overwhelming evidence against Appellant. PCRA Court Opinion, 8/26/21, at 22. Further, the evidence of the deposit would not have bolstered Appellant's defense because it is consistent with the evidence presented by the Commonwealth that Appellant rapidly exhausted the $60,000 to $80,000 he received from Kerkowski in March 2002 before hatching the plan to rob Kerkowski to cover the closing costs in early May 2002.

---

[11] Attorney Brown testified at the PCRA hearing that he did not recall the alleged deposit for Ronald's truck. N.T., 3/12/21, at 75.

### Caine Pelzer

Appellant's next ineffectiveness claims concern the testimony of defense witness Caine Pelzer, who testified that he met Weakley in a correctional institutional and Weakley provided him with a fabricated presentence investigation report ("PSI"), which Weakley told Pelzer "was written to show that [Appellant] is a rat and that [Weakley is] not a rat." N.T. (Trial), at 2614-18. Appellant first argues that counsel should have sought to introduce the PSI into evidence as a prior inconsistent statement, rather than under another hearsay exception. This claim lacks merit because, after extended argument, the trial court ultimately ruled that the PSI was admissible, and it was admitted during Pelzer's testimony. *Id.* at 2576, 2616; Defense Trial Exhibit 59.

Appellant further claims that trial counsel should have asked Caine to testify that "Weakley said he was being pressured into lying to beat another case[] and that he was being asked to say something not true in exchange for the promise of saving himself." Appellant's Brief, at 22. However, as the PCRA court explained, this statement by Weakley was clear hearsay, and no hearsay exception is asserted that would have allowed for its admission. PCRA Court Opinion, 8/26/21, at 22. Therefore, this claim lacks arguable merit.

### Donald Chaump

The final ineffectiveness claim concerning witnesses who testified at trial relates to Donald Chaump, who was called as a defense witness to testify that he was Weakley's former employer and that Weakley had a poor reputation

for truthfulness and honesty in the community. N.T. (Trial), at 2590-92. Appellant argues that trial counsel was ineffective for failing to ask Chaump whether Weakley had access to flex ties through his work of the kind used to bind Kerkowski and Fassett; he avers that this fact, if established, would have lent credence to the theory that Weakley planned the robbery and murders, rather than Appellant. However, Chaump testified that Weakley worked for him for six weeks in 2003, *id.* at 2591, after the date the murders were committed on May 3, 2002. Because Weakley's access to flex ties through his job after the murders were committed has no bearing on who planned the crimes of which Appellant was convicted, this claim has no arguable merit.

**Witnesses Who Were Not Called**

In his second issue, Appellant argues that trial counsel provided ineffective assistance by failing to call ten witnesses. In order to establish that trial counsel was ineffective for failing to call a witness at trial, the PCRA petitioner must demonstrate that:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.
>
> Prejudice in this respect requires the petitioner to show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case. Therefore, the petitioner's burden is to show that testimony provided by the uncalled witnesses would have been helpful to the defense.

*Commonwealth v. Bishop*, 266 A.3d 56, 65 (Pa. Super. 2021) (citation omitted).

Robert Higdon

The first individual as to which Appellant argues trial counsel was ineffective for failing to call as a witness is Robert Higdon, Appellant's uncle. Appellant avers that Higdon would have testified that Appellant had worked for him in the past, Higdon had previously lent Appellant money, and Appellant could have asked Higdon for money in May 2002 if needed. With respect to Higdon, Attorney Brown agreed with Appellant's counsel that the first three factors of the five-part test for ineffectiveness claims related to failure to call a witness were satisfied, specifically that Higdon existed, Higdon was available to testify for the defense, and trial counsel knew of the existence of Higdon. N.T., 3/12/21, at 76-77. However, Attorney Brown stated that it was his belief that he was not sure that Higdon would cooperate with the defense. *Id.* at 79-80. Appellant was required to prove that Higdon was willing to testify for the defense, *Bishop*, 266 A.3d at 65, yet Appellant did not offer any evidence to meet his burden, such as by presenting Higdon as a witness or introducing an affidavit or certification from the witness. *See Commonwealth v. Selenski*, 228 A.3d 8, 17 (Pa. Super. 2020) (holding, in Appellant's appeal from denial of PCRA relief related to Goosay robbery convictions, that Appellant did not demonstrate that a witness was willing to testify for the defense absent that witness's testimony at the PCRA hearing, admission of an affidavit from the witness indicating willingness to testify, or any other

evidence establishing willingness to testify). Accordingly, Appellant is not entitled to relief on this claim.

With respect to the remaining nine individuals not called as a witness as to whom Appellant alleges ineffectiveness, Attorney Brown agreed in his PCRA hearing testimony that each of the four factors of the five-part test were satisfied, that is that the witness existed, that the witness was available to testify for the defense, that trial counsel knew of the existence of the witness, and that the witness was willing to testify for the defense. N.T., 3/12/21, at 76-77. Therefore, for these remaining individuals, we will only address the fifth factor, whether "the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial." **Bishop**, 266 A.3d at 65 (citation omitted).

### Bill Jesse

Appellant argues that trial counsel should have called Bill Jesse, an investigator hired by the defense, to testify regarding a 2005 interview he conducted with Robert Steiner, the Commonwealth witness who discussed his sale of the Mount Olivet Road property to Strom and Appellant's request that Steiner remain away from the property for a day, which gave Appellant and Weakley the opportunity to bury the bodies. Appellant argues that Jesse's testimony would have established that Appellant's request to Steiner occurred prior to the April 30, 2002 closing on the house and thus before the date the murders occurred, May 3, 2002. **See** PCRA Exhibit D-5, at 2 (Jesse's report of April 21, 2005 interview with Steiner).

As the PCRA court points out in its opinion, however, Appellant seeks to introduce Jesse's account of his conversation with Steiner for the truth of the matter asserted, and, as such, it constitutes hearsay without any proffered exception. PCRA Court Opinion, 8/26/21, at 25. Jesse's testimony as to this conversation could not have been admitted substantively as a prior inconsistent statement by Steiner under our Rules of Evidence as it was not given under oath, did not appear in a writing signed and adopted by Steiner, and was not recorded. Pa.R.E. 803.1(1) (in effect March 18, 2013 to April 1, 2017). Further, Appellant does not argue that Jesse's testimony should be admitted for impeachment purposes, *see* Pa.R.E. 613, and instead he only sought to call Jesse to show that Steiner absented himself from the property on a date when it was impossible that the burial of the bodies could have occurred. Therefore, Appellant has not demonstrated that Jesse could offer any relevant testimony at all, and we cannot infer any prejudice from trial counsel's decision not to call him.

<u>Francis McBride and Jeff Schultz</u>

Appellant raises similar ineffectiveness arguments with respect to two individuals who were incarcerated with Weakley after the murders, Francis McBride and Jeff Schultz. Appellant maintains that McBride, who was Weakley's cell mate in 2007,

> would have given significant testimony showing Weakley gave inconsistent statements, and also admitted to doing the crime and looking to blame [Appellant] for it. [McBride] had information that Weakley admitted to him he killed Tammy [Fassett] and gave details about how; that Weakley had threatened McBride and his

family if McBride ever said anything; the flex ties were from the company Weakley worked for; and that Weakley said he was receiving preferential treatment from [the] DA's office for his cooperation.

Appellant's Brief, at 24; **see also** PCRA Joint Exhibit 6A (McBride's April 30, 2007 and May 18, 2007 statements to law enforcement). Appellant argues that Schultz "would have testified that he heard Weakley say[, while they were incarcerated together,] that prosecutors were coaxing him into embellishing his story to implicate [Appellant] and that Weakley was getting a deal for testifying." Appellant's Brief, at 24; **see also** N.T., 3/12/21, at 88. Appellant argues that these statements would have called into question Weakley's motives for cooperating with the police and whether his trial testimony was truthful. Appellant's Brief, at 24

Again, Appellant has failed to explain under what exception this clear hearsay testimony by McBride and Schultz would be admissible at trial, although it appears that the proffered testimony could have been admitted as prior inconsistent statements for impeachment purposes if the statements had first been disclosed to Weakley during his testimony.[12]  Assuming the

---

[12] **See** Pa.R.E. 613(b) (extrinsic evidence of prior inconsistent statement admissible for impeachment where first disclosed to the witness, witness is given opportunity to explain or deny statement, and adverse party has opportunity to question witness); **Commonwealth v. Charleston**, 16 A.3d 505, 527 (Pa. Super. 2011), **abrogated on other grounds by In re L.J.**, 79 A.3d 1073 (Pa. 2013) (Commonwealth was permitted to admit impeachment witness who testified as to other witness's prior inconsistent statement when first witness was confronted with statement as required by Rule 613(b)). We note, however, to the extent McBride would have testified that Weakley

*(Footnote Continued Next Page)*

admissibility of the testimony, the PCRA court found that the absence of McBride's and Schultz's testimony was not so prejudicial as to have denied Appellant a fair trial, noting that trial counsel had already successfully assailed Weakley's credibility and motives during cross-examination and any such further evidence would be repetitive and that any further attack on Weakley through the testimony of McBride and Schultz would not have altered the course of the trial in light of the prodigious evidence marshalled by the Commonwealth to show Appellant's guilt. PCRA Court Opinion, 8/26/21, at 25-27. We agree with the lower court's conclusion and find that it is supported by the record at the PCRA hearing. N.T., 3/12/21, at 23-24 (Attorney Brown testifying, referring to Weakley, that "there's only so many times that you call a liar, a liar. . . You've made your point and you want to stop beating a dead horse."); *id.* at 88 (Attorney Brown testifying that there were diminishing returns to continually attempting to cast Weakley as a liar and having a greater involvement in the murders than what his testimony portrayed and further that he did not have independent confirmation of the veracity of McBride's statements to police, which were made long after the murders).

_____

threatened McBride and his family if McBride disclosed certain information Weakley said to him, this would likely be inadmissible as a specific, unrelated instance of Weakley's conduct reflecting on his credibility. *See* Pa.R.E. 608(b)(1).

### Jennifer Dysart, PhD

Appellant claims that trial counsel was ineffective for not calling Dr. Jennifer Dysart, a psychologist who authored an expert report concerning the accuracy and reliability of eyewitness identifications, specifically related to Louise Bensacon, Kerkowski's neighbor who identified him driving away from the scene of the murder, and Samuel Goosay, the victim of another robbery perpetrated by Appellant. Appellant argues that Dr. Dysart's expert report and testimony would have illustrated "how well a witness could identify and provide facts under the circumstances . . ., which could have placed doubt in the jurors['] minds as to whether these witnesses, even doing their best, could accurately make these identifications." Appellant's Brief, at 25.

The PCRA court addressed this issue as follows:

[T]he absence of Dr. Dysart's testimony was not so prejudicial as to have denied [Appellant] a fair trial, as trial counsel did not need Dr. Dysart's expert opinion, due to the cross-examinations of [Bensacon] and [] Goosay. [N.T., 3/12/21, at 11]; *see Commonwealth v. K.M.*, 680 A.2d 1168, 1172 (Pa. Super. 1996) (Trial counsel is not ineffective for failing to call an expert witness if counsel can "effectively cross-examine prosecution witnesses and elicit helpful testimony"). Trial counsel elicited testimony on cross-examination that [Bensacon] was near and far-sighted, requiring the use of glasses[,] and [that there were] obstructions from her vantage point looking out the window when she saw the [Appellant]. [N.T. (Trial), at 1403-08]. Trial counsel gauged [Bensacon's] ability to identify by showing her a picture and asking questions "regarding that, and whether or not she could accurately see what was going on outside the window." [N.T., 3/12/21, at 37, 63; N.T. (Trial), at 1410-13.] Trial counsel also cross-examined [] Goosay regarding identifying the Defendant during the robbery. [N.T. (Trial), at 2366-75, 2379-82.]

Trial counsel elicited testimony on cross-examination that []
Goosay did not "get a good look at the person that stayed behind"
during the robbery, he was unable to identify [Appellant] during
multiple picture lineups, and his eventual identification of the
[Appellant] was months after the robbery and could have been
influenced by the media. [**Id.** at 2366-75.]

Further, Dr. Dysart's testimony would not have helped the
defense. Trial counsel made a

> judgment call in terms of whether or not she was needed.
> In my view, the cross-examination of [] Goosay and
> [Bensacon] . . . by itself casts serious doubt on the
> identification; and frankly, I just didn't think that Dr. Dysart
> could add anything else. She couldn't conclude that any
> particular factor influenced these particular witnesses. I
> think her testimony would really be limited to be able to say
> that in these identifications there existed factors that could
> [a]ffect a witness's accuracy. And I think that at the end of
> the day, given the cross-examination, how the testimony
> played out with the alleged two eyewitnesses, that the —
> their testimony through cross was sufficient to cast doubt
> on their perceptions and their ability to recall.

[N.T., 3/12/21, at 11 (testimony of Attorney Rymsza).]
Furthermore, Dr. Dysart "didn't have any specific literature
[related to the present identifications] . . . she couldn't offer any
opinion about identification of vehicles, for instance." [**Id.** at 14.]
Dr. Dysart could not "say that any particular factor influenced
[Bensacon] . . . [s]o I think it had some limited value." [**Id.** at
17-18.] Additionally, Dr. Dysart's testimony would not have
helped to discredit [] Goosay's identification of the [Appellant], as
[] Weakley stated that he and the [Appellant] robbed [] Goosay's
home. [N.T. (Trial), at 1189.]

PCRA Court Opinion, 8/26/21, at 27-28.

The PCRA court's analysis is supported by the record. Trial counsel

effectively cross-examined Bensacon and Goosay, eliciting helpful testimony

casting doubt on their identification of Appellant, which obviated the need to

call Dr. Dysart to opine generally regarding eyewitness identification issues.

***Williams***, 141 A.3d at 464; ***K.M.***, 680 A.2d at 1172.  Appellant presents no argument to this Court as to how Dr. Dysart's analysis would have benefited his case more than the cross-examination by trial counsel.

<u>Greg Pockevich</u>

Appellant argues that trial counsel was ineffective for failing to call Greg Pockevich as a witness, who "would have testified that he heard Weakley [tell Patrick] Russin in December 2002 that Weakley could have put [Appellant] away for a long time if he just [told] police to look near the well."  Appellant's Brief, at 25; ***see also*** PCRA Exhibit D-7, at 3-5; PCRA Exhibit D-8, at 3. Appellant asserts that trial counsel should have called Pockevich "to keep hammering Weakley's involvement and showing he was setting Appellant up." Appellant's Brief, at 25.

This claim fails because Pockevich's testimony as to Weakley's statement to Russin is hearsay and Appellant has not explained what hearsay exception would have allowed its admission.  Moreover, as the PCRA court stated in its opinion, this claim lacks merit where it does not challenge Weakley's account of his involvement in the murders or burial of the bodies. PCRA Court Opinion, 8/26/21, at 29.  The lower court further explained that, to the extent Pockevich would have portrayed Weakley in a negative light, his testimony "would have been repetitive of previous evidence" as trial counsel did not need to "call [] an endless number of witnesses to discredit [] Weakley and show his involvement in the murders."  ***Id.***  Appellant is entitled to no relief on this claim.

- 47 -

Trooper Gerald Sachney

Appellant argues that trial counsel was ineffective for failing to call Trooper Gerald Sachney, who investigated the Goosay robbery, to testify as to the following information he learned during his investigation:  (1) a witness saw an Oldsmobile or Buick pulling away from Goosay's house, rather than a white Honda; (2) blood found at Goosay's house matched Weakley, not Appellant; (3) a hair on a glove in Weakley's car did not match Weakley, Appellant, or Goosay; (4) certain unspecified DNA did not match Weakley, Appellant, or Goosay; (5) Weakley sold jewelry from the Goosay robbery along with coins presumably stolen in another robbery; (6) there two other named suspects in the robbery; and (7) Weakley admitted to smoking a cigarette with Goosay.  Appellant contends that Trooper Sachney's testimony "would have challenged Goosay's credibility and Appellant's involvement in the murders."  Appellant's Brief, at 26.

Appellant did not prove his entitlement to relief on this claim as he did not call Trooper Sachney to testify at the PCRA hearing and he submitted no evidence showing that Troper Sachney uncovered the information described above during his investigation of the Goosay robbery and would have testified to that effect during the instant trial.  *See* 42 Pa.C.S. § 9543(a); *Bretz*, 830 A.2d at 1276.  Furthermore, we fail to discern any prejudice to Appellant from not calling Trooper Sachney when Appellant specifically directed his counsel not to examine Goosay regarding the facts of the robbery because his direct

appeal in that case remained pending, *see supra*, an instruction that he presumably would have carried over to Trooper Sachney's testimony as well.

Dave Kelly

Appellant claims that trial counsel was ineffective for not calling Dave Kelly, who was incarcerated with Patrick Russin at a state correctional institution and who "could testify that Russin admitted to getting off just by putting [Appellant] away and that Russin got special privileges" in prison. Appellant's Brief, at 26. Appellant avers that this testimony "would call into question Russin's testimony and his motive for implicating Appellant." *Id.*

Appellant has failed to prove his entitlement to relief on this claim when he did not present Kelly at the PCRA hearing or submit any evidence that would show that Kelly would testify as described above. *See* 42 Pa.C.S. § 9543(a); *Bretz*, 830 A.2d at 1276. Further, when asked if he recalled the substance of Kelly's testimony, Attorney Brown only responded that he was "[v]aguely" aware of Kelly's name and that "a number of inmates" had "made statements like that." N.T., 3/12/21, at 80.

Even assuming Appellant proved that Kelly would have testified to Russin's admissions and his special privileges in prison and that such testimony would be found admissible through a hearsay exception, we agree with the PCRA court that no prejudice is evident from the exclusion of Kelly's testimony. PCRA Court Opinion, 8/26/21, at 30-31. Russin's statement that he was "getting off just by putting [Appellant] away," Appellant's Brief, at 26, was truthful and did not serve to discredit him where he entered into a plea

agreement with the Commonwealth whereby he was convicted of third-degree murder in the "Rudy Redman" killings and received a sentence of 10-to-20 years' imprisonment in exchange for his testimony in the present case. N.T. (Trial), at 2066-72; PCRA Court Opinion, 8/26/21, at 30. Furthermore, Appellant testified extensively to this benefit at trial, N.T. (Trial), at 2066-72, 2111-15, and it is unclear how testimony to other, unspecified "special privileges" that Russin received would have had any greater effect on the jury's consideration of his testimony. PCRA Court Opinion, 8/26/21, at 30-31; Appellant's Brief, at 26.

### Roger Brown

Appellant contends that trial counsel was ineffective for failing to call Roger Brown, Kerkowski's bail bondsman, who would have testified that Kerkowski's father paid off his son's bond when his son did not appear for sentencing. *See* PCRA Exhibit D-12 (Brown's statement to police). Appellant argues that this testimony "would show that the Kerkowski parents knew of their son's illegal activities, and believed that his disappearance was not surprising, and that they did not want people out there looking for Kerkowski." Appellant's Brief, at 26.

The absence of Brown's testimony was not so prejudicial as to have denied Appellant a fair trial. As the PCRA court explained, Brown's testimony was immaterial to Appellant's convictions as it only related to events after the robbery and murders and had no bearing on Appellant's culpability to his crimes. PCRA Court Opinion, 8/26/21, at 31. Furthermore, there is reason to

believe that such testimony would have actually damaged Appellant's case when it would have drawn more sympathy to Kerkowski's aged mother, the only member of the family to testify at trial. ***Id.***; ***see also*** N.T., 3/12/21, at 34-35, 64-66.

<u>Rose Manfre</u>

Appellant argues that his representation at trial was deficient based upon the failure of trial counsel to present Rose Manfre, Kerkowski's neighbor, as a witness to testify that there was no cellular phone coverage in the vicinity of her and Kerkowski's homes at the time of the murders. Appellant asserts that this testimony would call into question how Appellant could have telephoned for a ride and left Kerkowski's house before Weakley if he never used Kerkowski's home phone. Appellant contends that calling Manfre would also have cast doubt on Bensacon's testimony that she saw Appellant driving away from Kerkowski's house in a brown vehicle.

Appellant did not call Manfre as a witness at the PCRA hearing or present any evidence to demonstrate how Manfre would testify regarding cell service; therefore, Appellant has not proved his entitlement to relief on this claim. ***See*** 42 Pa.C.S. § 9543(a); ***Bretz***, 830 A.2d at 1276. Furthermore, we agree with the PCRA court that Manfre's testimony would be of limited value and therefore would not have called into question whether Appellant received a fair trial. PCRA Court Opinion, 8/26/21, at 33. Manfre was a lay witness who could not offer testimony as to the range of all cellular service providers in the vicinity of her home in May 2002; further, there was no indication that she

shared the same provider as Appellant. *Id.* Moreover, even if there was no service, this would not rule out that Appellant was picked up from Kerkowski's house as he could have used a landline or arranged for a ride in advance. *Id.*

**Timeline of Events on Date of Murder**

Appellant next argues that trial counsel was ineffective for not doing more to challenge the "very specific timeline" of events on May 3, 2002, the date of the murders. Appellant's Brief, at 27. Appellant contends that "[h]ad counsel pointed out these impossibilities properly, the jury would [have] call[ed] into question the credibility of various Commonwealth witnesses, which likely would have resulted in a different result at trial." *Id.* at 28.

Appellant points to three sets of inconsistencies. First, Appellant insists that the Commonwealth's timeline from the point of Appellant and Weakley's arrival at the Kerkowski house to the time when the robbery began "does not make sense." *Id.* at 29. Appellant cites Weakley's testimony that he arrived with Appellant at approximately 2:00 p.m. and that the two men drank beer and talked with Kerkowski and Fassett for over an hour; yet Weakley also stated that Kerkowski needed to leave at 3:00 p.m. to pick up his children at daycare by 4:00 p.m. and "there [was] no issue that Kerkowski was ever late in leaving or having to get ready to leave." *Id.*; N.T. (Trial), at 1067-77, 1080. Appellant also points to Bensacon's testimony that she saw Kerkowski mowing his lawn between 2:00 and 4:00 p.m.—which means that Appellant and Weakley would have had to have arrived well after 2:00 p.m.—and Kerkowski's mother's testimony that she had a 15-minute telephone

conversation with Fassett while Appellant and Weakley were present that took place between 2:30 p.m. and 4:00 p.m. N.T. (Trial), at 354-55, 359, 1390.

Appellant also argues that "[t]here is no possible way that the timeline immediately after the murders could be accurate." Appellant's Brief, at 29. He notes Weakley's testimony that he left Appellant behind to finish cleaning up and drove away from Kerkowski's house with the two bodies, arriving at the Luzerne home he shared with Appellant at approximately 7:00 p.m. N.T. (Trial), at 1132. Appellant contends that this timeline does not accord with Bensacon's testimony that she saw Appellant drive by at approximately 5:00 p.m. *Id.* at 1405.

Lastly, Appellant argues that the timeline later on the evening of the murders "was similarly impossible." Appellant's Brief, at 29. Appellant references Kerkowski's parents' testimony that they returned home from dinner on May 3, 2002, at approximately 10:00 to 11:00 p.m., to discover that their son had not picked up his children from daycare and they then drove to Kerkowski's house. N.T. (Trial), at 357, 1615. However, Bensacon stated that she began taking notes after speaking with Kerkowski's father and that the journal Bensacon kept tracking the events related to Kerkowski's disappearance shows her first entry at 9:36 p.m., which preceded the time that the Kerkowski parents had even arrived home from dinner. *Id.* at 1445.

The PCRA court concluded that Appellant was not prejudiced by trial counsel's decision not to probe further at trial into the timeline on the date of the murders. The court explained that the timeline "was derived years after

the murders" and "is only an approximation." PCRA Court Opinion, 8/26/21, at 34. "It is possible that the time estimations given by witnesses were off, however, they were not so far off as to make the murders impossible or would have changed the outcome of the proceeding." *Id.* The court noted that Appellant's timeline issue concerning the events before the murder was based upon Kerkowski having to leave at 3:00 p.m. to go to the daycare, but this argument ignores that 3:00 p.m. was not a deadline for the murders to have been completed by as Kerkowski never in fact left his home due to Appellant and Weakley's acts. *Id.* The court further found that Appellant had not demonstrated that his departure from Kerkowski's house at 5:00 p.m., according to Bensacon, and Weakley's arrival in Luzerne by 7:00 p.m. were inconsistent or unfeasible. *Id.* at 35. Finally, the PCRA court concluded, with respect to the inconsistency between Kerkowski's parents' arrival home from dinner at 10:00 p.m. and Bensacon's first journal entry at 9:36 p.m., that the

> discrepancy of when the phone call took place [between Bensacon] and Mr. and Mrs. Kerkowski was not so prejudicial as to warrant a new trial. Pointing out a twenty-four minute time difference between when a phone call took place, hours after the murder, would [not] have discredited three witnesses so much as to have changed the jury's mind as to not convict [Appellant], especially with the overwhelming amount of evidence presented by the Commonwealth.

*Id.* at 35-36.

We agree with the PCRA court's analysis. We emphasize, as the PCRA court did, that the trial took place 13 years after murders and that the bodies were not discovered for more than a year after the murders took place; thus,

the witnesses were not required to rigorously record the victims' and their own movements as more likely would have occurred if the case had been a homicide investigation from the outset. The witnesses' trial testimony was accordingly set forth as ranges of time or explicitly as an approximation of when the events occurred. ***See, e.g.***, N.T. (Trial), at 1405 (Bensacon stating that she saw Appellant drive away "[b]efore dinner, about 5:00-ish, something like that"); ***id.*** at 432-33 (trial counsel asking Mrs. Kerkowski whether conversation with Fassett occurred closer to 4:00 than 2:30 p.m. and Mrs. Kerkowski responding that she "really can't say" when it occurred exactly, but it was in the afternoon before the two needed to leave to pick up Kerkowski's children from daycare). Furthermore, as the PCRA court explained, the timeline of the events on May 3, 2002 appeared to be feasible with minor discrepancies that the jury could easily understand based upon the passage of time and the fact that no one was contemporaneously tracking their movements in detail on the day in question. Appellant also failed to present any evidence at the PCRA hearing to back up his assertion that the timeline was actually impossible, such as the distance between Kerkowski's house and his daycare or the Luzerne house at which Appellant and Weakley resided or records of the exact time of telephone calls made on the date in question. Accordingly, and in light of the copious evidence presented at trial against Appellant, we conclude that he is not entitled to relief on this PCRA claim.

**DNA Evidence**

Appellant next argues that trial counsel was ineffective in the handling of DNA evidence found in Goosay's house and in Weakley's trunk that showed the presence of another individual who may have been involved in the Goosay robbery. Appellant's ineffectiveness claim is two-fold; first, he contends that counsel should not have stipulated to this evidence, N.T. (Trial), at 2680-82, and instead should have presented a forensic scientist to testify to that effect. Second, Appellant argues that trial counsel should have investigated the DNA test results further to demonstrate "a different accomplice to Weakley for both the Goosay robbery and the murder[s]" of Kerkowski and Fassett. Appellant's Brief, at 30.

As Appellant concedes, his trial counsel did in fact present the evidence showing that there was DNA on objects found at Goosay's residence and in Weakley's car matching an additional individual through a stipulation entered into between the defense and Commonwealth. N.T. (Trial), at 2680-82. Additionally, the trial court instructed the jury that they were to treat the stipulation as a proven fact. **Id.** at 108-09, 2683. Appellant has done nothing to demonstrate that the choice to present this evidence through a stipulation rather than a live witness was anything more than a reasonable strategic choice by counsel. **See Commonwealth v. Thuy**, 623 A.2d 327, 334 (Pa. Super. 1993) (counsel was not constitutionally ineffective for presenting character evidence through stipulation rather than witnesses when trial court properly instructed the jury to consider stipulation as evidence; "Whether to

use live witnesses or place before the jury appellant's good character by stipulation is nothing more than a strategic decision."). Appellant has also not shown prejudice from trial counsel's apparent failure to investigate the identity of the individual whose DNA was recovered. To the extent another individual was involved in the Goosay robbery that is of little consequence to the present case, and any suggestion that this individual was also involved in the Kerkowski and Fassett murders, which occurred nine months prior to the Goosay robbery, is based upon nothing more than tenuous speculation. Appellant's PCRA claim based upon trial counsel's alleged mishandling of the DNA evidence thus fails.

### Cell Phone Records

In his final PCRA claim, Appellant contends that trial counsel was ineffective for not "using [Appellant's] cell phone records at trial," which he alleges would have "showed multiple calls being made at the same time Weakley claimed that he and Appellant were beating, killing[,] and torturing the victims." Appellant's Brief, at 31. Appellant asserts that "[i]t would have made no sense for [] Appellant to be making calls during this time period." *Id.*

Appellant did not submit any evidence concerning his cell phone records or elicit any testimony concerning the use of these records at the PCRA hearing, nor has he presented any substantive argument concerning the manner in which his cell phone records would contradict the other evidence set forth at trial or how the absence of these records prejudiced him.

Therefore, Appellant did not prove this claim as mandated by the PCRA. **See** 42 Pa.C.S. § 9543(a); **Bretz**, 830 A.2d at 1276. Moreover, we agree with the PCRA court that this argument directly contradicts his other claims concerning the absence of cell phone service at the Kerkowski house and further that evidence of Appellant making phone calls before or after the murders took place does not negate his involvement in the murders. **See** PCRA Court Opinion, 8/26/21, at 37. Appellant is not entitled to relief on his final PCRA claim.

## Conclusion

Based upon our thorough review of Appellant's PCRA petition, the trial and PCRA records, the PCRA court's opinion, and the parties' appellate briefs, we conclude that each of Appellant's PCRA claims fails for the reasons outlined above. We therefore affirm the PCRA court's August 26, 2021 order denying Appellant's PCRA petition.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/08/2023